Our next case, 21-2003, U.S. v. Leal. Mr. Davidson, you may proceed. Good morning, your honors. May it please the court and counsel for the government, Ms. Walters, my name is Scott Davidson and I represent Gaspar Leal in this appeal. There are three issues before the court. The first one having to do with outrageous government conduct. The second having to do with sufficiency of the evidence of a conspiracy. And the third having to do with a substantively unreasonable sentence of 360 months. Returning to the first issue. Mr. Davidson, can I just ask an overarching question? And in particular, I think it relates to the first issue. In your brief, you used the word this appeal focuses on district court case 3308, which is the Carmona conspiracy. That's my my understanding of all that we're talking about, right? Case 3308. I mean, I got confused in the government's brief where it purported to, and I was going to ask the government this too, purported to loop in this other case, the other charge that he had. So aren't we only talking about the universe of facts related to that 3308? Your honor, that's a good question. And I apologize if there was confusion on my part. With respect to the outrageous government conduct issue, I don't think there was a good claim under the 3069 case, the Tapia deal of outrageous government conduct. And we did not claim that there was. With respect to outrageous government conduct, the claim is looking at the evidence that was presented to the jury with respect to the Carmona deal. The, uh, there was, uh, the government had directed this from start to finish. Now, with respect to, um, the sufficiency of the evidence, again, our claim is pertaining to the Carmona deal. We're not challenging the Tapia deal with respect to suffices, the evidence with respect to the sentence, your honor, the sentence of 360 months. If you contrast that with, there are four co-defendants, two in the Tapia deal Candace Tapia got 18 months, Bernadette Tapia got 21 with respect to the Carmona deal, Luis Arreola Palma got 48 and Daniel Carmona got 60. So with respect to the third issue, your honor, uh, judge Holmes, the, uh, I think it is fair to look at all of it, but with respect to the third issue, you're looping in the defendants, the co-defendants in the Tapia deal. So as a point of contrast and, uh, in making a disparity argument, is that right? That's correct, your honor, but, but, uh, your honor is correct that with respect to outrageous government, we are just talking about the Carmona deal. I don't think there would be a fair argument on our part that there was something about outrageous government conduct with respect to Tapia. Okay. Let me, let me ask you this question then, which flows from that, um, to be clear on what the universe of facts, uh, would have been then, um, there was some discussion, I think, and, and, and I think I got this from the government's brief about the fact that initially the encounter between, uh, the informant and Mr. Leal was at his, uh, I guess, uh, uh, improvised barbershop or something like that, and that there was a purchase of cocaine and meth, uh, at that particular occasion, at least it wasn't marijuana. I know, I thought it was cocaine and meth or heroin. One of the, one of those two, did the jury in the Carmona case know that? No, your honor, they did not. The, the way that the evidence was presented in the Carmona, uh, deal in that trial, in the 3308 case was that, uh, Mr. had given a business card for, uh, haircuts, mobile haircuts to an ATF task force officer in Albuquerque that task officer then gave the card to special agent of ATF, Mike Ramos, who then gave that information, maybe that card or that number to the CI in this case to contact Leal and that's at volume one of the appendix at page 50. Now the government contends, uh, with all due respect to opposing counsel, I think erroneously on page 15 of the answer brief that Leal directed the, uh, the deal and that Leal first contacted the CI. With respect, I think that the evidence at trial in the 3308 case is contrary to that, and again, if you look at volume one at page 50, um, now the reason that we have a, uh, a government, uh, outrageous government conduct, um, issue here, uh, your honors is that the government engineered and directed these two sham deals from beginning to end. So, uh, Ramos testified that everything that the CI did was under his, Ramos's, uh, direction and authorization. And he was asked by government's counsel, did, did the CI do anything that you didn't authorize? He said, nope, not that I know of. So the, everything the CI did was directed by Ramos. He said, talk to Mr. Leal to get, um, to, to put some deals on the table. Cause that's what the CI does. He travels around the country and puts these deals on the table for the government. And he he's paid pretty well for it. Did not Leal contact the CI on the, in engineering, both, uh, uh, communications that resulted in the two, uh, transactions for which he was charged? No, your honor. I don't think that's accurate. What happened was the CI, the CI contacted Leal initially, but let's go with initially, were there two calls from the jail that involved the defendant? Later on, there were two, yes. And those two calls resulted in the transactions for which, uh, the defendant is charged, right? Well, I think I would step back for the shorter in, uh, looking at the, uh, I think that, uh, Mr. Leal was involved in the middle of the case. Uh, the district court even said at that sentencing, uh, that Leal was more of a middleman. He did make efforts along the way. There's that's the record is clear. My point is that this, these transactions were initiated by the government and consummated by the government and Mr. Leal only played a role in the middle. Well, if he's a broker, if he's a broker and a middleman, and he initiates broker middleman stuff, uh, that's far from the government engineering this deal from beginning to end, he's trying to facilitate and, and just attack onto that. And you can respond to that initial point, but as a tack onto that, wasn't there evidence that indicated that Mr. Leal hoped to get a cut? And what did we make from that? I mean, it would seem to me that suggests that he's, he's got an interest in this thing. Two points, John, our first with respect to initiate, uh, with all due respect, I would push back on that characterization. There were calls made by Leal during the middle of the series of events, but I wouldn't call those initiations because the initial conduct was from the government and the government concluded Mr. Leal was involved in the middle. So I think it's, um, uh, he's making calls because the government is saying we would like something other than marijuana. And so how about talk to this guy? What about to follow up on judge Holmes question in the, one of those two, three way calls, uh, with Ariella, Paul Palma and Casillas and the informant didn't Leal, uh, initiate the part where he said, let's get Carmona on the phone. So, because Carmona is going to give me the guy that will be able to give you, um, the, uh, the meth didn't, didn't, didn't, isn't the evidence that they all tried to get Carmona on the phone. And that he's in fact, the one that suggested Carmona as being the guy that can supply the meth. Your honor, it is true that Mr. connected the CIA through audio to Palma to his cousin, Ariella, Ariella Palmas, cousin, Mr. Carmona that is in the record, but with respect to the word meth, the government has conceded and the record is, uh, corroborates that there was no evidence at trial that Mr. Leal was ever on a phone call where the word meth or the amounts were discussed. That is on page 12 of the government's brief. And the evidence is clear that meth was not discussed in any calls that Mr. Leal was in. But Leal referred, I'm sorry, were you going to say something? No, please go ahead. Please. Okay. But backing up a little bit in the initial call where Leal told the informant to contact Casillas, didn't Casillas, when he contacts the that you're interested, that, that you sell heroin and meth. And so isn't that, you know, I mean, you don't have to be a rocket scientist to figure out that Leal was referring him to Casillas knowing that the, that the, uh, uh, uh, that, that the defendant was interested, that Leal was interested in selling heroin and meth. And that Casillas is going to be the guy that can, you know, put that together. I realized he only sold pot, but apparently he, he knew people, which he did, that can also supply heroin or meth, right? Well, uh, uh, Leal, uh, did put, um, Mr. did put the CIA in touch with Carmona and those deals were consummated between the CIA or Carmona. And those did involve meth. But, um, Mr. Leal did not, there's no evidence that he, that he knew that there was, uh, uh, meth going to be involved specifically in those transactions. I think the transaction said, sorry. I think the transaction judge, uh, back rack is alluding to is the call in which the informant calls Casillas, Casillas says, and the informant says, you know what I want and the, and, and Casillas says using street Lang slang for, I think heroin and meth, I mean, and, and the, and why couldn't a reasonable jury infer that the only place Casillas could have learned that he wants heroin and meth is from Leal. Because the informant had the discussions with Casillas and the informant is the one who told Casillas, I'm not interested in marijuana. I'm interested in black Jordans, which is slang for black heroin. And I hang out with crystal, which is street language for meth. That comes from the CI. Now the, at test trial, uh, Ramos, and I believe the CI testified that Casillas had told the CI that Leal had told Casillas that the CI was only interested in meth and heroin. But that's not evidence that Casillas didn't testify to that. And there's no evidence that the government concedes that Leal was never on a call where meth was discussed. No, I don't. And there's, there's no evidence that he even mentioned it in slang. I'm sorry. Well, that wouldn't necessarily be the point. And I would have to, and I'm not going to take the time right now to go back and see what the source is, but there's certainly a, a, a, a interaction and conversation between Casillas and the informant where at least my you know what I want. And then Casillas tells him, yeah, I know what you want. Minishing the black Jordans and the other slang term. And, and so I thought the communication of yes, this is what you want went from Casillas to the informant. That's not your understanding. My understanding, your honor, is that initially when the CIA and Casillas talked that Casillas said, you know, Hey, I just deal in he used some slang for, for marijuana, low grade and high grade. And he said, I just do the low grade marijuana. And then my understanding is the CIA then tells him that he's interested in the discussion about black Jordans and crystal, but that was between Casillas and the CIA. And of course, Mr. Leal's not on that call. The question simply though, the question for purposes of your sufficiency, the evidence argument, however, is how, whether this came as a shock to Mr. Casillas, that this is what the CI wanted. And whether Leal had communicated that to him, let me ask you just quickly on the outrageous government conduct, a more overarching question. Why aren't you doomed under plain error review? Because there is, unless something has changed since Dyke and we have a more recent case, I think that was unpublished that dealt with outrageous government conduct, unless something's changed, we have never found. Outrageous government conduct. And if we have never found the case to be outrageous government conduct, there would have been no basis or guideposts or template for the district court to know when the government stepped over the line. And so if you're under plain error review, how could we ever determine that this was clear or obvious error? Your Honor, I would, my answer to that is that I don't think you need a case in which the, this court has applied the well-trod ground of what the outrageous government conduct defense requires. In Dyke, the language the court uses, engineers and directs the criminal enterprise from start to finish. Well, Dyke, whether it even exists as a doctrine, I mean, whether it's even viable and, and so the district court sitting there with the, with the doctrine that we have said in Dyke may not even be viable, how does, how does that play into a question or whether it was clear or obvious error? Well, Your Honor, the prior cases of Mosley from 82 and Harris of 83 under this court's jurisprudence and a later panel as in Dyke cannot overturn a decision of a, Judge Hartz, I see that my time has expired. May I continue? Briefly. Yes. The later panel cannot overturn the decision of an earlier panel. So the, the, the, the doctrine in this court's jurisprudence is articulated in Mosley and Harris that the defendant's predisposition is not part of that then that is, uh, outrageous government conduct. And that is clear and obviously the law in this circuit. And if the facts pertain to that, then I think it does meet the plain error standard. And so that you're just one quick follow-up. So the point you're, your position would then be, we don't need a case in which we have actually found outrageous government conduct in order to have this error be clear and obvious. Correct. Because the doctrine is so well-established. All right. Judge Bacharach, any questions? Uh, no. Thank you, Judge. Okay. Thank you, Mr. Davidson, Ms. Walker. Good morning, your honors. May it please the court, Tiffany Walters for the United States. Leal contends that the government unfairly targeted him for investigation. And as a result, he participated in a conspiracy to distribute an unknown quantity of an unknown drug. But the record shows that he knew what he was doing. To convict on the conspiracy charge, the government did not need to prove that Leal knew the exact type or the exact amount of drugs that he was conspiring to distribute. Instead, the government was required to prove that Leal was generally aware of the conspiracy scope and objective. Well, he had to know the scope and objectives included more than 50 grand of meth, right? So it's not a question of, he just had to know that there was a drug offense underway. So I think that the law would be that he doesn't have to know the exact quantity to down to the gram or, but he doesn't need to have the general idea of the scope and here it could have an idea that scope could include over 50 grams of meth, right? And here the evidence is sufficient to support that. I'm looking, drawing all reasonable inferences in the government's favor. The trial evidence was more than sufficient for a reasonable jury to conclude that Leal was generally aware of the scope of the conspiracy. I'd like to walk through some of the calls that the court's previously discussed. Before you get to that, Ms. Walters, can I just, I want to make sure that I understand the implications of Aniyah with what you just said, because Aniyah on his face, doesn't it suggest that all the defendant under 841A, the defendant just has to that there was a conspiracy to distribute a controlled substance, you know, it could be anything. When it comes to the sentencing, you know, if we're talking about Elaine, for example, you know, there may be issues about, you know, the particular substance, the particular quantity, but under Aniyah, and maybe this is just an academic question, but I want to make sure I understand it. Does the defendant need to know what kind of controlled substance it is, or is it the government's position that the defendant just needs to know that it is a conspiracy to distribute a controlled substance, might be marijuana, might be methamphetamine? I think under Aniyah, it's clear that it just needs to be a controlled substance. I think in Aniyah, the individual, the defendant was actually constructing containers within cars to transport the drugs and had deliberately chosen not to know the identity of the substance. And that is not sufficient to defeat a conspiracy. But under Elaine, under Elaine, the kind of drug is going to increase the mandatory minimum. And that is under Elaine, that is an element of the offense, right? Correct. And I suppose the question and looking at Aniyah is whether or not the knowing requirement for the conspiracy attaches to that drug amount. And I think in Aniyah, this court at least cites, I think Sixth Circuit case law, which said there is no mens rea that attaches to that amount. What this court has done in, in Eileen cases, and there hasn't been an Eileen challenge raised here, has been to look to what's attributable to the defendant under that. So they're not, the court's not looking into whether the defendant has specific knowledge as to type and amount, but whether or not it was attributable in that it was within the scope of the conspiracy and generally, or, and reasonably foreseeable. Well, scope, well, reasonably foreseeable in scope of conspiracy means that he has to have an idea that this, that meth could have been within the scope of this conspiracy, right? Correct. So this court has, has I believe in cases where the marijuana has been the issue where, where the defendant was aware that there was a broader drug trafficking operation that was sufficient to bring other drugs within it. So it requires something more than thinking this is a deal that's only involving one particular type of drug, but where there's a sense that there's other things going on. That's not enough to escape the conspiracy. And I think it's important to distinguish the substantive conspiracy charge from the Eileen issue with the, the 841, because this court has held that with conspiracy, we haven't overruled that case law that says you don't have to know the precise amount and type of drug and Eileen. It's, it's still not that knowing requirement. It's looking to reasonable foreseeability and what's attributable. And even in that context, this court has sort of pointed out that Stigler when an defendant is integral to the conspiracy, it may well be that the defendant is that all the amounts are directly attributable to them or that they're responsible for the overall conspiracy in this case. Oh, I'm sorry. I'm sorry. And just work with me for a second here. And the, if it's one thing to say under an 841 conspiracy or 846 for that, you don't need to know the specific drug to be convicted of that offense. Okay. That's fine. But the point is, if at post Elaine, you, a element of the offense that will create the mandatory minimum is that you, that there be a certain quantity involved, you have to have some idea that there is that quantity involved right in order for you to be convicted of an offense that carries the mandatory minimum, right? Correct. But this court is never. If I'm understanding you and perhaps judge Holmes said this also, the, what you need to know is just that it's reasonably foreseeable that that volume, or do you need to know something more particular than it's reasonably foreseeable that the transaction would involve more than 50 say grams of meth or whatever. So, um, this court has looked to whether it was within a scope and reasonably foreseeable distinguishing that perhaps you could reasonably foresee things that are outside of the scope of your agreement and you wouldn't be responsible for those, but where it's within the scope of the agreement and reasonably foreseeable, um, then one would be responsible for that quantity. So if you're in a drug conspiracy and just to put a fine point on it, you're in a drug conspiracy. You have to have some, you have to know that it's within the scope of the transactions involved, uh, and reasonably foreseeable that there would be meth involved over 50 grand, not well, some quantity that would trigger the mandatory minimum for purposes of a lane. Right. So, so, so, okay. So that, so, so it would not, if you're just trucking along thinking you're doing marijuana and, and there's no reason that you would have to believe this conspiracy involved anything that would trigger a mandatory minimum, you could not be convicted of that crime. Correct. The one caveat I would make to that, that statement was that in Ellis, this court didn't quite, um, quite abandoned Steiger, which allows the defendant to be responsible for the overall amount of the conspiracy, but it did understand Steiger to mean that it's, uh, limited to situations where the defendant is integral to the conspiracy. So it sort of collapses in a case like this, because when you're talking about reasonable foreseeability, you're really talking about, are you liable for crimes, you know, transactions committed by your co-conspirators that you weren't directly involved in. And here that distinction doesn't play out, which is why all of this sort of is a distinction without a difference in this case, because we're talking about the very transactions that layout arranged and then the quantities of drugs that were just in those transactions under the theory of the defendant, we all arrange as these, but never with any understanding that, that the, the big quantity, the drug involved, the one that would trigger the mandatory minimum was at play. In other words, I, at least as I understood the defendant's theory. Yes. Okay. I'm a drug, I'm a drug dealer. Yes. I was arranging the, uh, brokering for drug deals, but I thought marijuana was on the table and that's all they were going to do. And so in order to convict him, um, we're talking now the sufficiency of the evidence one. He would have to have, know that within the scope of the conspiracy, the conspirators, obviously not the, the, uh, the, the informant, but within that scope was the drug meth. And, and, and it could, it was reasonably foreseeable that that amount would exceed 50 grand. Yes. I would like to just, just clarify slightly on that. So we have both the substance of conspiracy. And if, if you look at the Eileen factor, the amount, even if the jury didn't find that he could still be guilty of the substance of offense of conspiracy without that, uh, the amount. So not the a level, you'd be down to a C level, but the charge would still stand. I mean, that doesn't go to that knowledge piece. Um, and, and he was convicted of the, he was convicted of the, of the Elaine piece, right? That's what he's challenging on, on appeal, right? Well, he hasn't framed it as an Eileen argument. I know, but I mean, the point I'm making is he's challenging his conviction of cons of conspiracy to traffic meth in excess of 50 grams. Correct. Except I would say that I think he's arguing that there's no agreement that there's no conspiracy at its core. I think that his argument is a little broader than just the Eileen error, which is why we're trying to be careful about making that distinction, because I think he's saying that the absence of a specific drug type and quantity destroys the essence of the conspiracy agreement, and I don't think that's this court's case law. Okay. May. Yes, I agree with that. But I guess, uh, as I understood, let's, let's take, for example, the Casillas transaction. When he sends the informant to Casillas, the argument that the defendant is making was, I didn't know that they were going to talk about meth. I thought this was just going to be a marijuana deal. Well, that the fact that it was a marijuana deal would get him a conspiracy to traffic in narcotics, but that is not what he's challenging on appeal. In other words, he's admitting that I was, I would be a broker for a marijuana deal. I just want a broker for over 50 grams of meth. And so, so isn't that 50 grams of meth portion? And I really am trying to understand the distinction here. Isn't that 50 grams of meth relevant to his sufficiency of the evidence challenge, because he's admitted I'm a broker for marijuana. It would be relevant to the sufficiency of the evidence as to the Eileen factor, but it wouldn't destroy the, the core agreement of the conspiracy because he wouldn't need to know that specific drug and specific quantity when he knows he's entering into a conspiracy to distribute a controlled substance. But if Eileen is an element of the offense, he's challenging his conviction. For the offense that resulted in the mandatory minimum, is he not correct? Although I would, I, I would point this court to the Ellis case where the distinction was made between the sufficiency of the evidence for the conspiracy and the sufficiency of the evidence on the Eileen factor, that even without the Eileen factor, the conspiracy conviction, at least without the aggravating mandatory minimum survives that, so I think it doesn't. Well, I thought that, I thought that an Ellis with the question was how much drugs, not, not, not, not that he wouldn't be subject to the mandatory minimum. I thought the question was how much, how many, what was the quantity of drugs that would be attributed to him based upon the transactions in question? In other words, the difference between, uh, your conviction of the overarching conspiracy and how much the guidelines would attribute to you. Those are two distinct things. And, and so in Ellis, I thought the remand was to say, okay, you're convicted of a conspiracy that involves all these drugs, but on remand, we've got to determine whether this was in the scope of your jointly undertaken criminal activity under the guidelines. Those are two different things. Yes. I believe Ellis actually has two parts. One that deals with the sufficiency of the evidence for the conspiracy and says that that argument fails because even if, even apart from this Eileen argument, the, um, the evidence would be sufficient to support a C-level charge. Um, but then, but the core of Ellis is about the Eileen and whether or not it's sufficient to support the mandatory minimum. All right. And I just think it's bare. I think, um, that Lael has conflated the two and attacked the conspiracy and tried to draw that knowing mens rea down into the drug quantity. And I think that's an important difference that there is no knowing mens rea as to that drug quantity. But as the court lays out in Ellis, uh, the court can look to reasonable foreseeability and scope of the agreement. Um, if there's no further questions on that specific issue, I'll talk a little bit more about the sufficiency of the evidence on, on these actual calls. Um, I just wanted to piggyback on some of judge Holmes questioning on the initial call. So to, to walk it through the initial call, um, Lael calls the informant and says, um, call this guy if you want some. And the informant interprets this as it's the beginning to set up a drug deal. So he calls Casillas the same day. Now, when he calls Casillas, um, the informant says, all right, did he told you, did he tell you what I do? Presumably referring to Lael. And Casillas says, kind of, I think he said something about, you like to hang around with homegrown crystal methamphetamine. Um, and then they talk a little about crystal and then, and, uh, I think he told me something that about that you push the black, that you'd be selling black Jordans referring to, to heroin. Um, so that, that information is reasonably from this transcript coming from Lael. So Lael at least knows that the informant is looking for meth and is looking for and the formant tells Casillas very directly. No, you know, heroin is slow. I'm not looking for that. What he's looking for is meth and the quantity is two ounces, two zippers. So that's established in that call. Now, the next call we have a few days later, we have Casillas, Lael, Areola Palma and the informant on the call. So we know from the fact that this call is occurring that Lael knows that the Casillas deal didn't work out. Uh, because he's still working with Casillas to set up another drug transaction. Uh, and then, uh, we have them on the phone discussing it and, and Lael's, uh, expressing his understanding that he's going to get a cut of this deal. And so I think it's reasonable for the jury to infer from that ongoing participation of Lael and Casillas that in fact, Lael was aware of the informant's requirement. And in addition, one can infer from the fact that the actual deal involved, the transfer of two ounces of meth, that the agreement that everyone was discussing was in fact for two ounces of meth. So the distinction between the knowledge and the, the Alene factor here sort of collapses because here, even on the record for substance of conspiracy, there is sufficient evidence that Lael had this knowledge of, uh, both amount and, and drug type. And I see my time is almost expired. I have not addressed outrageous government conduct. Does the panel have any questions for me on that? There's no further questions on the panel. Um, I would ask the court to affirm. Thank you, counsel. Case is submitted. Counselor excused.